### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CYNTHIA PRYOR, | |
| Plaintiff, | Case No. 20-CV-28 |
| v. | Magistrate Judge Sunil R. Harjani |
| TARGET CORPORATION, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Cynthia Pryor has brought a motion to compel Defendant Target Corporation to produce the documents described in Target's Second Amended Privilege Log. Doc. [52]. In ruling on this motion, the Court is presented with the applicability of the attorney-client, insured-insurer, and work product privileges to the claim notes and correspondence described in Target's latest privilege log. For the reasons stated below, the Court finds that Target has largely failed to demonstrate that those privileges apply, and grants in part and denies in part Pryor's motion to compel.

### Background

This case involves an alleged slip and fall taking place at a Target store in Oak Lawn, Illinois on November 13, 2017. Doc. [1] at 5. According to Pryor, she was walking with her friend near the "Market" area of the store when she slipped and fell on water. *Id.* Pryor initiated this lawsuit against Target on November 12, 2019 in the Circuit Court of Cook County, Illinois. *Id.* at 1. On January 3, 2020, Target removed the action to federal court based upon the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1441, et seq. and 28 U.S.C. § 1332. *Id.*

1

**Discussion**

The parties, who are currently engaged in discovery, have come to loggerheads again regarding Target's privilege log. In the present motion, Pryor argues that Target's third attempt, the Second Amended Privilege Log, Doc. [52-5], fails to meet the criteria set out in Rule 26(b)(5) of the Federal Rules of Civil Procedure, as well as this Court's standing order on privilege logs. Doc. [52] at 3-5. Pryor accordingly requests that this Court find that Target has waived the privileges asserted in the Second Amended Privilege Log. *Id.* at 5, 11. Alternatively, Pryor requests that the Court order Target to tender the documents to the Court for in-camera inspection and thereafter order the production of the documents. *Id.* at 11.

In response, Target argues that the privileges it asserted in the Second Amended Privilege Log—attorney-client privilege, insured-insurer privilege, and work product privilege—apply and protect the documents from production. Doc. [56]. Target asks that the Court deny Pryor's motion to compel, or in the alternative, order that Target file an affidavit in support of the privilege assertions made in its brief before ordering the production of any documents. *Id.* at 8.

As discussed below, the Court finds that Target's Second Amended Privilege Log is noncompliant and fails to demonstrate the applicability of the attorney-client and insured-insurer privileges. However, the Second Amended Privilege Log suggests that a handful of the described documents may be subject to the work product doctrine. The Court thus grants in part and denies in part Pryor's motion to compel.

**I.      Target's Second Amended Privilege Log is Still Deficient**

Rule 26(b)(5) of the Federal Rules of Civil Procedure requires a party claiming privilege over otherwise discoverable information to take two steps. First, the Rule requires that the party "expressly make the claim" of privilege. Fed. R. Civ. P. 26(b)(5)(A)(i). Second, the Rule requires that the party "describe the nature of the documents, communications, or tangible things not

2

produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii). Generally, a withholding party takes these steps through the creation of a privilege log. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 218 (N.D. Ill. 2013).

As stated in this Court's standing order on privilege logs, any privilege log must be detailed enough to enable other parties to assess the applicability of the privilege asserted, and should include: (1) the name and capacity of each individual from whom or to whom a document and any attachments were sent (including which persons are lawyers); (2) the date of the document and any attachments; (3) the type of document; (4) the Bates numbers of the documents, (5) the nature of the privilege asserted; and (6) a description of the subject matter in sufficient detail to determine if legal advice was sought or revealed, or if the document constitutes work product. *See RBS Citizens,* 291 F.R.D. at 218.

While Target's latest privilege log includes dates, document types, Bates numbers, the privileges asserted, and document descriptions, the log lacks specificity with respect to the identities of various authors and recipients. In particular, the log includes the following vague descriptions: "Sedgwick Senior Claims Adjuster Ryan," "Target Store-T2087," "Target Support," and "Target Human Resources Representative." Doc. [52-5] at 3, 5, 6. Those descriptions fail to identify the name and capacity of each individual from whom or to whom a document and any attachments were sent. That information is particularly important here because attorney-client privilege, as will be discussed further below, is limited to Target employees within Target's control group.

## II. Target Has Not Shown that Attorney-Client Privilege Applies

Target argues that each document listed in the Second Amended Privilege Log is protected by the attorney-client privilege. As the party claiming privilege, Target "carries the burden of

3

presenting facts that give rise to the privilege." *Janousek v. Slotky*, 980 N.E.2d 641, 650 (Ill. App. Ct. 2012) (citation omitted). Because this is a diversity jurisdiction case, the application of attorney-client privilege is governed by Illinois law. *See Wielgus v. Ryobi Techs., Inc.*, No. 08 CV 1597, 2010 WL 3075666, at *3 (N.D. Ill. Aug. 4, 2010) (citations omitted). To establish attorney-client privilege under Illinois law, the claiming party must show the threshold requirements for each withheld document, including: "(1) that the communication originated in a confidence that it would not be disclosed'; '[that] it was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services,'; and (3) 'that [it] remained confidential.'" *Sullivan v. Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2013 WL 2637936, at *2 (N.D. Ill. June 12, 2013) (citations omitted).

For a corporation asserting attorney-client privilege under Illinois law, the "control group" test applies. *Hyams v. Evanston Hosp.*, 225 Ill.App.3d 253, 257-58 (1st Dist. 1992). Under the control group test, an employee personifies the corporation for purposes of the attorney-client privilege when she is a member of the corporation's control group, defined as top management who have the ability to make a final decision or those without whose opinions a final decision would not ordinarily be made. *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 119–20, 432 N.E.2d 250, 257–58 (1982).

In this case, Target asserts that claims representatives from Sedgwick, a third-party administrator, are part of Target's control group. "To prove that a non-employee agent is a member of the corporate principal's control-group, the party claiming privilege must show: 1. the non-employee agent served as an advisor to top management of the corporate client; 2. this advisory role was such that the corporate principal would not normally have made a decision without the agent's opinion or advice; and 3. the agent's opinion or advice in fact formed the basis of the final

4

decision made by those with actual authority within the corporate principal." *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 192 F.R.D. 263, 267 (N.D. Ill. 2000) (citing *Consolidation Coal*, 432 N.E.2d at 258).

Target's Second Amended Privilege Log contains 45 entries, which can be fairly bucketed into two categories of documents. Doc. [52-5]. The first group of documents contains claim notes authored by Sedgwick claims adjusters written to "Claim File" regarding the investigation into Pryor's accident. *Id.* at 1-5. The second group consists of eight emails and one letter exchanged between Sedgwick claims adjusters and various Target entities, such as "James Foglton, Leader on Duty, "Target Support," "Target Human Resources Representative," and "Target Store-T2087." *Id.* at 5-6.

Target has failed to show that the attorney-client privilege applies to the documents described in Target's Second Amended Privilege Log in at least two ways. First, Target has failed to show that the Sedgwick claims adjusters and Target entities listed in the privilege log are part of Target's control group. In its brief, Target asserts generally that Sedgwick works as a third-party administrator for the benefit of Target and Target's insurer, ACE American Insurance Company, and that Sedgwick acts as an advisor to top management at Target "as to the final decision-making process for claims and litigation." Doc. [56] at 1, 5. Yet Target did not provide any affidavits or contracts reflecting the relationship structure between Target, Sedgwick, and ACE, so the Court is left without sufficient information to assess whether Sedgwick adjusters are agents of Target, let alone non-employee agents who are part of Target's control group.

Even if Target had made the requisite showing with respect to the Sedgwick claims adjusters, attorney-client privilege can be broken if the correspondence is sent to non-control group employees, *see Midwesco-Paschen Joint Venture for Viking Projects v. Imo Industries, Inc.*, 638

N.E.2d 322, 329 (Ill. App. Ct. 1994) (citation omitted), and Target has failed to identify the actual humans who corresponded on behalf of "Target Human Resources Representative," "Target Store-T2087," and "Target Support." Target has likewise neglected to explain those individuals' roles and responsibilities. Without that information, the Court cannot apply the control group test because the Court cannot know whether these individuals are top-level managers with decision-making authority, or employees with more limited responsibilities. Even the descriptor for James Folgton, "Leader on Duty," is ambiguous and unhelpful for purposes of the control group test. "Leader on Duty" could mean a general manager in charge of the entire store, a shift manager slotted for a particular time on the day of Pryor's accident, or it could just be a promotion title Mr. Folgton earned after working at Target for a certain number of years. Simply put, Target's Second Amended Privilege Log and briefing fails to elucidate the names, roles, and responsibilities of the Target entities, and thus fails to show that attorney-client privilege protects the documents listed in the Second Amended Privilege Log.

Target asserts that under Illinois law the control group "consists not only of decision-makers or top management, but also those who directly advise top management and upon whose opinions and advice the decision-makers rely." Doc. [56] at 4 (citing *Mlynarski v. Rush Presbyterian-St. Luke's Med. Ctr.*, 213 Ill. App. 3d 427, 431, 572 N.E.2d 1025, 1028 (1991)). Although it is true that the *Mlynarski* case did recognize that a corporation's control group includes employees who directly advise top-management, the case does not support Target's position here.

In *Mlynarski*, the defendant hospital claimed that a letter written by one of the hospital's risk management coordinators to the hospital's outside counsel was protected from discovery by attorney-client privilege. 572 N.E.2d at 1027. On appeal, the *Mlynarski* Court reviewed the control group jurisprudence and recognized that there are "two tiers of corporate employees whose

6

communications with the corporation's attorney are protected." *Id.* at 1028. The first tier "consists of the decision-makers, or top management," while the second tier "consists of those employees who directly advise top management, and upon whose opinions and advice the decision-makers rely." *Id.* (citation omitted). The court then analyzed whether the hospital had satisfied its burden of showing that the coordinator was a member of the hospital's control group. *Id.* In that regard, the hospital had submitted an affidavit from the coordinator's supervisor stating that the coordinator was a member of the hospital's control group. *Id.* Because the plaintiff had failed to challenge the affidavit or respond to the hospital's control group argument, the *Mlynarski* Court found that it had no choice but to find that the hospital had satisfied the control group test. *Id.* Even then, the Court took care to clarify that it was not holding that an affidavit like the one provided by the hospital would always satisfy the control group test:

> [W]e do not mean to say that the sufficiency or the accuracy of affidavits such as that of Sandra Jones may not be tested in the trial court before a judge rules on whether information is discoverable. The extent to which Goldsberry participated in the decision-making process, the nature of her opinions, although not the specific opinions themselves, and the weight given her opinions should themselves be subject to inquiry.

*Id.* at 1028-29. So while it is true that a corporation's control group includes employees who directly advise top management, Target, unlike the hospital in *Mlynarski*, has failed to offer evidence showing that the undisclosed Target entities or Sedgwick adjusters actually do directly advise top management at Target and has offered no affidavits or documents regarding the extent to which the undisclosed Target entities or Sedgwick adjusters participated in the decision-making process, the nature of their opinions, nor the weight given their opinions by Target. Target has thus failed to show that the control group test is satisfied.

7

The Second Amended Privilege Log's second inadequacy in illustrating attorney-client privilege is more foundational. Even with the control group test, the basics of the attorney-client privilege still apply. That is, Target has to show that there was a communication flowing to or from an attorney for the purposes of securing or providing legal advice or services. *See Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 563 (N.D. Ill. 2007) (citations omitted). Here, not one of the 45 entries in the Second Amended Privilege Log includes a lawyer in the author or recipient fields.[1] In fact the majority of entries do not even appear to be communications, but rather notes to file made by the claims adjusters.[2] In a footnote to the Second Amended Privilege Log, Target asserts that the claim notes are "reviewed by various adjusters employed to evaluate and investigate this claim, Target's [a]ttorney's at Johnson and Bell, Ltd., as well as Target's in-house attorneys and paralegals." Doc. [52-5] at 6 n.1. However, the fact that an attorney may eventually review a document does not make that document a communication made to an attorney for the purpose of securing legal advice.

In sum, Target is a corporation. To successfully claim attorney-client privilege it must show not only the basic elements of attorney-client privilege, but also the elements of the control group test. Target has failed to do so through the Second Amended Privilge Log and its response brief. The Court therefore finds that the attorney-client privilege is not met in this case.

---

[1] Target argues that because the insured-insurer privilege applies to Sedgwick's communications, it does not matter if an attorney is on the correspondence or not. Doc. [56] at 2. Yet, as the Court explains below, Target has failed to satisfy the elements of insured-insurer privilege. As a result, Target's argument misses the mark.

[2] To the extent those claim notes document conversations with various Target entities, *see, e.g.*, [Doc. 52-5] at 1, the privilege log note descriptions still fail to demonstrate that the communications were made for the purposes of seeking or conveying legal advice, so the attorney-client privilege would still not apply.

### III. Target Has Not Shown that Insured-Insurer Privilege Applies

Target also asserts insured-insurer privilege over each document in its Second Amended Privilege Log. Under Illinois law, when an insurer has an obligation to defend the insured, a communication made between the insured and insurer is cloaked by the attorney-client privilege. *People v. Ryan*, 30 Ill. 2d 456, 460, 197 N.E.2d 15, 17 (1964). The rationale for the insured-insurer privilege, as explained by the Supreme Court of Illinois in *Ryan*, is that when the insurer has a duty to defend the insured, the "insured effectively delegates to the insurer the selection of an attorney and the conduct of the defense of any civil litigation." *Id.* Under those circumstances, the *Ryan* Court held that "the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured." *Id.* at 461. To establish a privilege for a communication between an insured and an insurer, one must demonstrate: "(1) the insured's identity; (2) the insurance carrier's identity; (3) the insurance carrier's duty to defend the insured; and (4) that a communication was made between the insured and an agent of the insurance carrier." *Exline v. Exline*, 277 Ill.App.3d 10, 13, 659 N.E.2d 407, 410, 213 Ill.Dec. 491, 494 (Ill.App. 2 Dist.1995) (citing *Rapps v. Keldermans* (1993), 257 Ill.App.3d 205, 212, 195 Ill.Dec. 354, 628 N.E.2d 818).

In this Case, Target has satisfied only two elements of the insured-insurer privilege. Target's Second Amended Privilege Log identifies the insured's identity, Target, as well as the insurance carrier's identity, ACE American Insurance Company. Doc. [52-5] at 6 n.1. In its brief, Target further identifies Sedgwick as a third-party administrator for Target and ACE, and represents that "if Sedgwick is unable to settle a claim, [Sedgwick] retains counsel for the purposes of defending the claim or lawsuit[.]" Doc. [56] at 1-2. Yet Target has offered no evidence exhibiting a duty owed by Sedgwick or Ace to defend Target. Target has not even argued that Sedgwick or ACE have that duty, just that Sedgwick *would* retain counsel if unable to settle the

9

claim. Moreover, even if Target had averred in its brief that Sedgwick and/or ACE have a duty to defend Target, arguments made in briefs are not evidence. *See United States v. Stevens*, 500 F.3d 625, 628 (7th Cir. 2007) ("[A]rguments in a . . . brief, unsupported by documentary evidence, are not evidence.") (emphasis in original); *see also Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) ("[I]t is universally known that statements of attorneys are not evidence.").

In the cases cited by Target, the insurer had a contractual duty to defend the insured. *See Ryan*, 30 Ill. 2d at 459, 460 (discussing insurer's "contractual obligation" and stating, "by the terms of the common liability insurance contract, the insured effectively delegates to the insurer the selection of an attorney and the conduct of the defense of any civil litigation"); *Lower v. Rucker*, 217 Ill. App. 3d 1, 2, 576 N.E.2d 422, 423, 424 (1991) (insurer had obligation to defend named insureds on an automobile liability policy with Economy Fire & Casualty Company); *Rapps v. Keldermans*, 257 Ill. App. 3d 205, 211, 628 N.E.2d 818, 822 (1993) (finding duty to defend existed where former employee of insurer filed affidavit stating that decedent was an insured covered by a policy issued by the insurer which required the insured to cooperate with the insurer for purposes of the investigation and defense of any claims made against them). In this case, while it is possible such contracts or policies exist, Target has failed to produce them or even offer an affidavit explaining any duty to defend by ACE or Sedgwick. Target has not established the duty to defend element of the insured-insurer privilege.

For the vast majority of the documents on the Second Amended Privilege Log, Target further fails to satisfy the final insured-insurer privilege element, which requires a communication between the insured and insurer. As described above, the first bucket of documents in the log are notes to file, not communications. From the document descriptions, it appears that some of the

10

claim notes may reflect conversations between Sedgwick adjusters and Target employees, which could perhaps constitute communications. However, many of the claim notes are described as dealing with attempts to contact various individuals and conversations with non-Target entities, such as other Sedgwick employees and a vendor in the store at the time of Pryor's accident. Doc. [52-5] at 2, 3. As a result, those documents would not be covered by the insured-insurer privilege. Because Target has failed to satisfy the final two elements of the insured-insurer privilege, the Court finds that the insured-insurer privilege does not apply.

### IV. Target Has Shown that the Work Product Doctrine May Apply to Some Documents

In addition to the attorney-client and insured-insurer privileges, Target also claims that each document in the Second Amended Privilege Log is covered by the work product doctrine. According to the work product doctrine, a party ordinarily "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial[.]" Fed. R. Civ. P. 26(b)(3)(A). The key requirement of the work product doctrine is that the purportedly privileged document must have been prepared in anticipation of litigation. "Although the litigation need not be ongoing or imminent, 'the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation.'" *Allendale Mut. Ins. v. Bull Data Systems*, 152 F.R.D. 132, 136 (N.D.Ill.1993) (citation omitted). For that reason, "[e]ven if litigation is imminent, the work-product doctrine does not cover documents prepared in the ordinary course of business rather than for litigation purposes." *Carlson v. Northrop Grumman Corp.*, 290 F. Supp. 3d 867, 873 (N.D. Ill. 2018) (citation omitted).

In *Allendale*, the court issued a standing order regarding the "increasing array of satellite litigation over the discoverability of large volumes of documents compiled by an insurer during its relationship with insured." 145 F.R.D. at 85. In examining work product jurisprudence, the *Allendale* Court reflected that determining when litigation is anticipated "eludes precision,"

11

particularly in the insurance context, "where insurers routinely perform investigations and accumulate files even when no litigation ensues." *Id.* at 86-87. In the *Allendale* Court's experience the insurance cases led to the work product doctrine becoming "an all-encompassing shroud of secrecy that is at once at odds with the federal rules' liberal discovery policy and the protection of attorney's thought processes and strategies the doctrine was designed to be." *Id.* at 87. The court lamented that discovery opponents in the insurance context "seem to use the doctrine to relieve themselves of the burden of producing factual information accumulated in what appears to be routine investigations." *Id.* The *Allendale* Court accordingly summarized that, in order to establish work product protection for a document, the discovery opponent must show: (1) the primary motivating purpose behind the creation of the document was to aid in possible future litigation; and (2) objective facts establishing an identifiable resolve to litigate. *Id.*

Applying those principles to Target's Second Amended Privilege Log, only a handful of documents appear to be candidates for work product protection. For the majority of the documents listed in the privilege log, Target has not shown that the documents are anything other than notes and correspondence created in Sedgwick's normal course of business in assessing risk and investigating claims. Specifically, the first 27 claim notes, created during the time period from November 20, 2017 to July 22, 2019, which describe Sedgwick's investigation progress, appear to have been created in the normal course of Sedgwick's business. Doc. [52-5] at 1-4. Of note, the genesis of those first 27 documents, Bates Nos. 000001-000083, appears to be the initial investigation of Pryor's accident as well as regular analyses and status updates provided by the claims adjusters to supervisors and colleagues. *Id.* Target, therefore, has not shown that those documents would be protected by the work product privilege.

The following document, however, Bates No. 000084-000094, is a claim note made on 7/24/2019 described as "Claim notes regarding analysis of Cynthia Pryor's attorney's demand letter." Doc. [52-5] at 4. That document may be covered by the work product doctrine, as the primary purpose of the document appears to be in anticipation in litigation, and the log provides objective details supporting a resolution to litigate, namely a demand letter from Pryor. After that document, the subsequent claim notes, Bates Nos. 000095-000114, document various analyses conducted by Sedgwick regarding liability generally and specific litigation documents, such as the affidavit of one of Pryor's witnesses and the complaint filed by Pryor in Cook County. *Id.* at 4-5. Those documents, too, appear to be candidates for the work product doctrine because they look like they were created specifically for, or in reaction to, the litigation against Pryor, and the log provides hints showing these claim notes reflect Target's resolve to litigate, such as documents involving "pre-litigation strategy." *Id.* at 4.

The remaining documents, Bates Nos. 000115-000133, consist of 8 emails and 1 letter exchanged between Sedgwick claim adjustors and various Target entities. The first seven of the documents are emails exchanged between the dates of November 20, 2017 and January 26, 2018. Doc. [52-5] at 5. Those documents, like the claims notes from that same time period, appear to pertain to the initial and routine investigation of Pryor's accident, and they do not appear to be documents made for the primary purpose of anticipation of litigation. For instance, several of the emails from this time period—according to the log—involve the completion of an incident report and the obtaining of contact information for a vendor, both of which are reminiscent of ordinary investigative or diligence steps, not steps taken primarily for the preparation of litigation. *Id.* at 5. As a result, Target has not shown that the first seven emails in the Second Amended Privilege Log, Bates Nos. 000115-000121, are protected by the work product doctrine.

13

The final email and letter described in the Second Amended Privilege Log, Bates Nos. 000122-000133 are from December 2019. Doc. [52-5]. While the descriptions for those documents discuss only the contact and employment status information for team members "involved in incident," the timing of the documents is telling. The first email from Sedgwick Claims Adjuster Colleen Hansen to "Target Support" was made the same day Ms. Hansen wrote a note to file regarding "analysis of complaint filed in Cook County, IL with strategy moving forward." *Id.* at 4. The subsequent letter from "Target Human Resources Representative" to Ms. Hansen was described as "[c]ontact and employment status reports generated by Target Support for Mary Zeritis and Ronald Pittman." *Id.* at 6. That correspondence, written after Pryor's demand letter and the filing of the complaint in Cook County, could represent Target's efforts to gather witnesses in support of its litigation strategy. Consequently, it is possible that the two final documents in the log, Bates Nos. 000122-133, are covered by the work product doctrine. All in all, Target has only shown that the work product doctrine could apply to a portion of the documents listed in the Second Amended Privilege Log.

Despite this, Target insists that the work product doctrine covers each document in the privilege log and argues that the only documents completed by Target in the ordinary course of business are the "Guest Incident Report, Leader on Duty Report, Team Witness Statements and Electronic Information Report-all of which were produced in Target's Responses to Mandatory Disclosures." Doc. [56] at 8. According to Target, everything else is created in anticipation of litigation, and therefore constitutes protected work product. *Id.* As an initial matter, it seems illogical that Guest Incident Report, Leader on Duty Report, and Team Witness Statements are made in the ordinary course of business while communications and claim notes about those documents would not be made in the ordinary course of business. *See, e.g.*, Doc. [52-5] at 5

14

(describing email from Sedgwick claims adjuster to James Foglton "relating to status of incident report"). Furthermore, Target maintains that Sedgwick works as a third party administrator that "documents the results of its investigation in its claim notes in anticipation of the *possibility of litigation* arising from a guest who is injured in a Target store." Doc. [56] at 1 (emphasis added). If it is Sedgwick's business as a third party administrator of ACE and Target to routinely document investigations in its claim notes for the mere possibility of litigation, the claim notes are made in the ordinary course of business, and not for the primary purpose of anticipating litigation. Target has additionally failed to show the second prong from *Allendale* for many of the claim notes. That is, the privilege log does not show objective facts establishing a resolve to litigate for each document listed in the log. *Allendale*, 145 F.R.D. at 87.

Target attempts to distinguish *Allendale* because that case involved an insurance coverage dispute: "Allendale involved an insurance coverage dispute, where the claim notes sought related to a fire loss investigation conducted by the insurers. Consequently, given the nature of the lawsuit, the claim notes and investigation documents were prepared in the ordinary course of business and not in anticipation of litigation." Doc. [56] at 9.[3] But the Court finds that Target's distinction is one without difference. Whether the nature of the lawsuit is insurance coverage or a personal injury claim, Target concedes that Sedgwick's role, even if litigation does not occur or is not

---

[3] Target additionally cites *Ready v. Grafton Ferry Boat Co*. for the proposition that insurance company documents are covered by the work product doctrine so long as they are prepared because of "some articulable claim, likely to lead to litigation." Doc. [56] at 9 (citing 2009 WL 3258183 (S.D. Ill. 2009)). True, but as the Seventh Circuit cautioned in *Logan v. Commercial Union Insurance Company* (a case relied upon by the *Ready* Court), "[w]hile much of the paperwork generated by insurance companies is prepared with an eye toward a possible legal dispute over a claim, it is important to distinguish between 'an investigative report developed in the ordinary course of business' as a precaution for the 'remote prospect of litigation' and materials prepared because 'some articulable claim, likely to lead to litigation . . . ha[s] arisen.' " 96 F.3d 971, 977 (7th Cir. 1996) (citation omitted). Here, based on the log provided by Target, the pre-July 2019 documents appear to be documents developed in the ordinary course of business, so Target's reliance on *Ready* does not support its position.

15

probable, is to document investigations and attempt to settle the claims. *Id.* at 1-2. Target does not represent that it only calls on Sedgwick for injuries that occur in the store that are likely to lead to litigation. Rather, Target states in its brief that Sedgwick generally investigates and documents its investigations for injuries that happen in Target stores. The reasoning of *Allendale*, thus, applies to this case. Consequently, but for the exceptional documents carved out above, Target has failed to show that the work product doctrine applies.

## V.     Relief

Bringing it all together, the Court finds that Target's Second Amended Privilege Log is deficient, and that Target has failed to support its blanket claims of privilege. Pryor urges the Court to find, in light of Target's deficient privilege log—one that followed two other deficient privilege logs—that Target has waived its privileges. However, because there is no evidence that Target or its counsel acted in bad faith, a finding of blanket waiver is inappropriate in this case. *See Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of U.S.*, 406 F.3d 867, 879 (7th Cir.2005 ) (finding blanket waiver inappropriate for a privilege log absent a bad faith finding); *Muro v. Target Corp.*, 250 F.R.D. 350. 360 (N.D. Ill. 2007) (citation omitted) ("Blanket waiver is not a favored remedy for technical inadequacies in a privilege log.").

Applying Target's privilege assertions on a claim by claim basis, the Court finds that Target failed to demonstrate that the documents listed in its Second Amended Privilege Log are covered by the attorney-client or insured-insurer privileges. With respect to the work product doctrine, the Court finds that the documents with the following Bates ranges may constitute privileged work product: 000084-000114 and 000122-000133.

Because the Court has granted in part and denied in part Pryor's Motion to Compel, the Court declines to apportion the expenses of this motion to either party. *See* Fed. R. Civ. P. 37(a)(5)(C).

## Conclusion

Plaintiff's Motion to Compel [52] is granted in part and denied in part. In accordance with this opinion, Target shall produce any non-privileged documents to Pryor by October 27, 2020. If Target maintains privilege with respect to any of the documents listed in the Second Amended Privilege Log, Target shall tender copies of any purportedly privileged documents to the Courtroom Deputy by November 3, 2020 for an in-camera review with a cover letter that seeks to explain why it believes those documents continue to be privileged. However, given the careful review the Court has given to the Second Amended Privilege Log in this opinion, Target should take great care in its submission and not submit each document listed in the log for in-camera review.

**SO ORDERED.**

Dated: October 20, 2020

                                                          Sunil R. Harjani
                                                          United States Magistrate Judge